## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                              **Plaintiff,**

        v.

LUIS JIMENEZ CARRILLO, AMAR
BAHADOORSINGH, JUSTIN ROGER
WALL, and JAMIE SAMUEL WILSON,
                              **Defendants,**

**and**

HAYDEE YOLANDA SANCHEZ DIAZ
MONGE, MARTHA Y. JIMENEZ
TRUST, and CHARLES A. CARRILLO
TRUST,

                  **Relief Defendants.**

Civil Action No. 21-CV-____ (___)

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the

following against the defendants and relief defendants:

## SUMMARY

1.      This is a securities fraud enforcement action.  Defendant Luis Jimenez Carrillo

("Carrillo") engaged in multiple deceptive schemes to sell publicly traded stock to investors.

From at least 2013 through at least May 2019 (the "Relevant Period"), Carrillo defrauded

investors by concealing the fact that he, in concert with others, controlled the securities of

numerous publicly traded companies—including the securities of Aureus, Inc. ("Aureus"),

Garmatex Holdings, Ltd. ("Garmatex"), and OneLife Technologies Corp. ("OneLife").

Defendants Amar Bahadoorsingh ("Bahadoorsingh"), Justin Roger Wall ("Wall") and Jamie Samuel Wilson ("Wilson") were Carrillo's partners in his scheme relating at least to Aureus.

2.      Carrillo's control of the securities of numerous publicly traded companies was the linchpin of the fraudulent schemes. It enabled him secretly to sell millions of shares of those companies' securities: (a) without registering the offers or sales of stock with the Commission; (b) without disclosing accurate information about his control over the companies; and (c) without complying with limitations on the sale of stock by company "affiliates" like himself. Carrillo also frequently sought to increase demand for the stock he and his associates were selling by organizing and funding various promotional campaigns. His schemes usually followed a similar pattern from company to company. Over the Relevant Period, Carrillo, working in coordination with others, generated trading proceeds of more than $75 million from fraudulently selling the securities of more than 30 issuers.

3.      Bahadoorsingh partnered with Carrillo at least relating to the Aureus scheme. He coordinated with Carrillo to sell Aureus securities without making required disclosures or complying with the limitations on sales of stock by company affiliates. Wall and Wilson also played critical roles in the Aureus scheme. They worked with Carrillo and Bahadoorsingh to control Aureus' securities, and coordinated with Carrillo and Bahadoorsingh secretly to take ownership of Aureus securities without making required disclosures and to deposit those shares for sale in brokerage accounts using false documentation. As a result of defendants' scheme, what appeared to be ordinary trading by unaffiliated investors was actually a massive dump of shares orchestrated by Carrillo, Bahadoorsingh, Wall and Wilson, who were seeking to profit at the expense of defrauded investors. Bahadoorsingh earned substantial profits from participating in the Aureus scheme, and shared those profits with Carrillo.

4.      A company is considered "public" when its securities trade on established markets and the company discloses certain business and financial information regularly to the investing public. Investors in certain public companies (including Aureus and OneLife) are required to disclose publicly any ownership interest in excess of 5% of the company's stock. All of the defendants were thus required to disclose their direct or indirect control over more than 5% of the stock of Aureus, and Carrillo was also required to disclose his direct or indirect control over more than 5% of the stock of OneLife and certain other public companies.

5.      Defendants engaged in schemes to make it appear that the shares they actually controlled were owned by multiple unaffiliated entities when, in reality, those entities were holding the stock as nominees for the group of defendants acting in concert. Carrillo, acting in concert with others (including Bahadoorsingh, Wall and Wilson on at least Aureus), typically controlled virtually all of the stock available for trading (the "float") for each company in his schemes.

6.      Carrillo also arranged to transfer the stock he controlled to at least two offshore asset managers to conceal further his control over the shares. The two managers, Wintercap SA ("Wintercap") and Blacklight SA ("Blacklight"), were both Swiss companies whose business focused on fraudulently concealing their clients' control over large blocks of stock that they were dumping into the public markets. Their business models extended beyond the defendants here. Wintercap and Blacklight have been charged in two separate cases for their fraudulent operation of illicit trading platforms for their clients. *See SEC v. Knox*, No. 18-cv-12058 (D. Mass., filed Oct. 2, 2018) (charging Wintercap, its operator and others); *SEC v. Bajic, et al.*, No. 20-cv-0007 (S.D.N.Y., filed Jan. 2, 2020) (charging Blacklight, its operators and some of its associates).

7.      Wintercap and Blacklight deposited Carrillo's stock in accounts at foreign and United States brokerage firms, in blocks of shares constituting less than 5% of each company's outstanding shares. Through the brokerage firms, Wintercap and Blacklight then sold millions of dollars of shares of Carrillo's stock to unsuspecting investors. Frequently, these sales took place at the same time as promotional campaigns that encouraged investors to purchase those shares.

8.      As a result of the conduct alleged herein, Carrillo violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c), 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77e(a), (c), 77q(a)(1), (3)], Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78j(b), 78m(d)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5(a), (c)].

9.      As a result of his conduct alleged herein relating at least to Aureus, Bahadoorsingh violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c), 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§77e(a), (c), 77q(a)(1), (3)], Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§78j(b), 78m(d)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5(a), (c)].

10.     As a result of their conduct alleged herein relating at least to Aureus, Wall and Wilson violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§77q(a)(1)-(3)], Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§78j(b), 78m(d)] and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §240.10b-5(a)-(c)].

11.     The Commission seeks a permanent injunction against the defendants, enjoining them from engaging in transactions, acts, practices, and courses of business of the type alleged in

this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)], together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], an order barring defendants Bahadoorsingh, Wall and Wilson from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. §78u(d)], and such other relief as the Court may deem appropriate.

12.     The Commission also seeks relief against Haydee Yolanda Sanchez Diaz Monge ("Monge"), the Martha Y. Jimenez Trust and the Charles A. Carrillo Trust (collectively, the "Trusts," and together, the "Relief Defendants"), who all received proceeds of the defendants' unlawful acts, practices and schemes and should not be entitled to retain those illegally-derived proceeds.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

14.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. For example, certain individuals who reside in Massachusetts purchased the stock of Aureus during the time period that it was being promoted by a boiler room hired by Carrillo.

## DEFENDANTS

15.     Luis Jimenez Carrillo ("Carrillo"), age 47, is a citizen and resident of Mexico. He was formerly a U.S. citizen and was formerly licensed to practice law in California and New Jersey. Carrillo remains licensed to practice law in New York. Carrillo was charged by the Commission in 2013 for his role as a securities attorney in facilitating a pump and dump scheme involving penny stocks. A judgment in that case was entered against Carrillo after his default. *See SEC v. Carrillo Huettel LLP, et al.*, Civil Action No. 13-cv-1735 (S.D.N.Y.).

16.     Amar Bahadoorsingh, age 50, is a resident of Vancouver, British Columbia, Canada, and a dual citizen of the United Kingdom and Canada.

17.     Justin Roger Wall ("Wall"), age 35, is a citizen and resident of the United Kingdom.

18.     Jamie Samuel Wilson ("Wilson"), age 41, is a citizen and resident of the United Kingdom.

## RELIEF DEFENDANTS

19.     Haydee Yolanda Sanchez Diaz Monge ("Monge"), age 43, is a resident of Chula Vista, California.

20.     The Martha Y. Jimenez Trust is a trust in the name of defendant Carrillo's mother that is the co-owner of record of the house located at 2908 Gate Five Pl., Chula Vista, California (the "California House").

21.     The Charles A. Carrillo Trust is a trust in the name of another relative of defendant Carrillo that is the other co-owner of record of the California House.

## RELATED ENTITIES

22.     Aureus Inc. ("Aureus") was formerly a gold exploration and mining company and

is now a food brand development company. Aureus (Ticker: ARSN) trades on OTC Link (previously, the "Pink Sheets"), operated by OTC Markets Group, Inc. Aureus was incorporated in Nevada in 2013 and is currently headquartered in Atlanta, Georgia.

23.     Garmatex Holdings Ltd. ("Garmatex") was originally incorporated in Nevada in 2014 as Oaxaca Resources Corp. In 2016, Oaxaca changed its name to Garmatex, changed its business to developing and supplying engineered fabric technology, and changed its headquarters to British Columbia, Canada. During 2016 and 2017, Garmatex (Ticker: GRMX) traded on OTC Link. After the events at issue in this Complaint, Garmatex changed its name to Evolution Blockchain Group, Inc. ("Evolution"). After the Commission suspended trading in Evolution's stock in 2018, OTC Markets Group, Inc. discontinued the display of quotations for Evolution, though it may continue to be traded on the Grey Market.

24.     OneLife Technologies Corp. ("OneLife") is a medical and health software technology company. After the Commission suspended trading in OneLife securities in October 2018, OTC Markets Group, Inc. discontinued the display of quotations for OneLife (Ticker: OLMM) though it may continue to be traded on the Grey Market. OneLife was incorporated under the name Oculus Inc. in Nevada in 2014 and is currently headquartered in Rolling Meadows, Illinois.

## BACKGROUND

25.     Persons who control companies that have stock that is sold to the public are subject to a variety of legal and regulatory requirements. Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

26.     Before selling stock, persons who control the stock of public companies ("control persons") are required to: (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell. Also, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock.

27.     "Restricted stock" is stock of a publicly traded company (also known as an "issuer") that is acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not registered with the Commission.  Stock held by an issuer or affiliate of an issuer is restricted stock. Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale). A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management. It also includes disclosure about any person or group who is the beneficial owner of more than 5% of the company's securities.

28.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e. a control person).  "Control" means the power to direct management and policies of the company in question.  Affiliates include officers, directors and controlling shareholders, as well as any person who is "under common control" with, or has common control of, an issuer. Absent registration of the stock, affiliates are only permitted to sell a small percentage of their stock according to SEC Rule 144 [17 C.F.R. §230.144].  As used herein, the term "control

group" means a group that collectively is an "affiliate" of an issuer.

29.     "Unrestricted stock" is stock that may legally be offered and sold in the public marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement filed with the Commission.  Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement.  Registration does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  Thus, when a control person buys publicly-traded or otherwise unrestricted shares in the company s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

30.     A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stocks.  Transfer agents routinely keep track of whether shares are restricted from resale.

31.     The Over-the-Counter ("OTC") Markets is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).  Public companies that do not have an obligation to file reports with the Commission may, nonetheless, choose to file public reports (such as quarterly and annual statements) on the OTC Markets website for investors to review and consider when making investment decisions.

32.     A "beneficial owner" of a security is any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power, which includes the power to dispose, or to direct the disposition of, such security.

33.     "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

## THE FRAUDULENT SCHEMES TO CONCEAL STOCK OWNERSHIP

### Example 1: Aureus

34.     Aureus was incorporated in Nevada in April 2013 and operated as a publicly traded company at times during the Relevant Period.

35.     In or about October 2014, approximately 34 Korean nationals purported to purchase 2,430,000 shares of Aureus for a total of $24,300 (the "Aureus S-1 Shareholders").

36.     On or about March 12, 2015, Aureus registered its securities pursuant to Section 12 of the Exchange Act. That registration was in effect through March 2017.

37.     On or about November 25, 2015, Aureus effected a 15-for-1 forward split of its common stock, which increased the total amount of shares issued to the Aureus S-1 Shareholders from 2,430,000 to 36,450,000.

38.     In August 2016, the transfer agent for Aureus recorded the transfer of three blocks of Aureus shares from groups of Aureus S-1 Shareholders to nominees that Carrillo had the ability to direct. First, Carrillo directly or indirectly acquired a block of 2,625,000 shares of Aureus from two Aureus S-1 Shareholders. Second, Carrillo directly or indirectly acquired a block of 5,250,000 shares of Aureus from a shareholder (who had acquired those shares from four additional Aureus S-1 shareholders). Third, he directly or indirectly acquired a block of

3,150,000 shares of Aureus from three additional Aureus S-1 Shareholders. These three blocks of Aureus stock were held by three different offshore nominee entities whose activities Carrillo had the ability to direct. For two of these blocks of shares, Carrillo engaged in additional attempts to obscure his ownership by transferring the shares from one offshore nominee he controlled to a second offshore nominee he controlled.

39.     The nominee entity through which Carrillo held the block of 5,250,000 Aureus shares was named Murray Capital Corp. Murray Capital was created by Wintercap personnel at the request of Carrillo, who asked Wintercap to create several nominee entities for Carrillo's use to hold and dispose of his shares of publicly traded penny stocks.

40.     At about the same time, Carrillo's partners, including Bahadoorsingh, Wall and Wilson, also facilitated the transfer of Aureus stock into the names of nominee entities they controlled.

41.     On or about August 3, 2016, Aureus' transfer agent recorded the transfer of 3,600,000 shares of Aureus to a Hong Kong entity controlled by Bahadoorsingh from three Aureus S-1 Shareholders. The Share Transfer Agreements that purport to document these three sales are falsified documents. Each of the three Share Transfer Agreements purports to sell to Bahadoorsingh's entity more Aureus shares than each of the selling Aureus S-1 Shareholders owned at the time. The three Agreements (dated in May 2015) reflect that each of the Aureus S-1 Shareholders is selling to Bahadoorsingh's entity the number of shares it had **only after** the November 2015 stock split that increased their shares by a factor of 15. Moreover, documents that purport to demonstrate that Bahadoorsingh's entity paid the selling Aureus S-1 Shareholders for these shares in May 2015 show a purchase price based on the increased number of shares that the Aureus S-1 Shareholders first owned in November 2015.

11

42.     The purported acquisitions of Aureus shares by Wall's and Wilson's entities are based on similar falsified documents.

43.     On or about April 11, 2016, Aureus' transfer agent recorded the transfer of 2,625,000 shares of Aureus to a United Kingdom entity controlled by Wall from three Aureus S-1 Shareholders.  Each of the three Share Transfer Agreements purports to sell to Wall's entity more Aureus shares than each of the selling Aureus S-1 Shareholders owned at the time.  The three Agreements (dated in April and May 2015), which were each signed by Wall, reflect that each of the Aureus S-1 Shareholders is selling to Wall's entity the number of shares it had **only after** the November 2015 stock split that increased their shares by a factor of 15.  Moreover, documents that purport to demonstrate that Wall's entity paid the selling Aureus S-1 Shareholders for these shares in April or May 2015 show a purchase price based on the increased number of shares that the Aureus S-1 Shareholders first owned in November 2015.  In addition, the bank account from which the wire remittance purporting to show Wall's entity paying the Aureus S-1 Shareholders for their shares was not even opened until about a year after the date of the purported wire payment.

44.     On or about July 28, 2016, Aureus' transfer agent recorded the acquisition of a block of 3,750,000 Aureus shares from four Aureus S-1 Shareholders by a different United Kingdom entity (sharing the same address as Wall's entity) which was controlled by Wilson. Each of the four Share Transfer Agreements purports to sell to Wilson's entity more Aureus shares than each of the selling Aureus S-1 Shareholders owned at the time.  The four Agreements (dated between April and June 2015), which were each signed by Wilson, reflect that each of the Aureus S-1 Shareholders is selling to Wilson's entity the number of shares it had **only after** the November 2015 stock split that increased their shares by a factor of 15.  Moreover, documents

that purport to demonstrate that Wilson's entity paid the selling Aureus S-1 Shareholders for these shares in April through June 2015 show a purchase price based on the increased number of shares that the Aureus S-1 Shareholders first owned in November 2015.

45.     On or about July 28, 2016, Aureus' transfer agent also recorded the acquisition of another block of 4,275,000 Aureus shares from a group of four additional Aureus S-1 Shareholders by a second United Kingdom entity controlled by Wilson (which also shared the same address as both Wall's entity and Wilson's first entity).

46.     In total, Carrillo, Bahadoorsingh, Wall and Wilson, directly or indirectly, acquired 25,275,000 shares of Aureus by August 2016 using seven foreign nominee entities (the "Aureus Nominees"). Aureus had approximately 126,450,000 shares outstanding at that time (5% of which was approximately 6,322,500 shares). Thus, Carrillo, Bahadoorsingh, Wall and Wilson collectively owned about 20% of Aureus' outstanding shares, and about 81% of its float.

47.     Section 13(d) of the Exchange Act and the Commission's rules promulgated thereunder require individuals acting alone or in a group to file reports with the Commission, which are available to investors, when those shareholders acquire more than 5% of the outstanding stock of a company registered under Section 12. Aureus was a company registered under Section 12.

48.     Carrillo formerly operated as a lawyer specializing in the United States federal securities laws. Carrillo knew about and understood, or recklessly disregarded, Section 13(d) of the Exchange Act, and his obligations under that statute to disclose his direct or indirect ownership, as part of a group, of more than 5% of Aureus's outstanding shares.

49.     Carrillo, Bahadoorsingh, Wall and Wilson used the Aureus Nominees to create the false appearance that none of the Aureus Nominees had to disclose their beneficial ownership

interest pursuant to Section 13(d) of the Exchange Act because, on paper, each of the Aureus Nominees held less than 5% of Aureus's stock.  In actuality, Carrillo, Bahadoorsingh, Wall and Wilson, acting in concert, controlled the Aureus Nominees.  As a result, through the Aureus Nominees, Carrillo and his partners, including Bahadoorsingh, Wall and Wilson, were the beneficial owners, in a group, of more than 5% of Aureus's publicly traded stock and were required to disclose that interest.  Carrillo, Bahadoorsingh, Wall and Wilson failed to disclose their beneficial ownership status as required by Section 13(d) of the Exchange Act.

50.     In addition to coordinated actions relating to Aureus, Carrillo and Bahadoorsingh worked together on multiple deals with a similar structure in that they and their partners together controlled 5% or more of a company's shares, but worked through nominee entities to conceal their ownership interest and sell those shares through brokerage accounts that obscured their identities.  Bahadoorsingh, Wall and Wilson also worked together on multiple deals with a similar structure in that they, and others, together controlled 5% or more of a company's shares, but worked through nominee entities to conceal their ownership interest and sell those shares through brokerage accounts that obscured their identities.  Bahadoorsingh sometimes interacted with the operators of Wintercap to shepherd payments from Wintercap to Wall and Wilson.

51.     Between approximately July 28 and August 17, 2016, Carrillo, Bahadoorsingh, Wall and Wilson, directly or indirectly and operating through the Aureus Nominees, orchestrated the transfer of the Aureus shares they controlled through the Aureus Nominees into brokerage accounts where they could be traded.  Carrillo, directly or indirectly, transferred the blocks held by three of the seven Aureus Nominees (including Murray Capital's block) to Wintercap.  These three blocks were immediately deposited into Wintercap brokerage accounts at foreign Brokers B, F and G.  Three of the remaining Aureus Nominees - controlled by Bahadoorsingh, Wall, and

14

one of the entities controlled by Wilson - deposited their blocks of Aureus stock with a U.S. broker ("Broker E").

52.     Wall and Wilson made false statements to Broker E in connection with their deposits of Aureus shares. Bahadoorsingh's entity, as directed by Bahadoorsingh, made similar false statements to Broker E. Specifically, each of Wall, Wilson and Bahadoorsingh's entity represented that it was not an affiliate of Aureus, and that it has not and would not act in concert with any other person in connection with their acquisition and sale of Aureus stock. Each also misrepresented that they were unaware of any planned promotions when they knew, or were reckless in not knowing, that the group of Carrillo, Bahadoorsingh, Wall and Wilson would act in concert to sell their shares while Carrillo arranged for Aureus stock promotions.

53.     In addition, one of the share transfer agreements that Wilson submitted to Broker E as justification for why Broker E should accept the deposit of his entity's Aureus shares purported to document an Aureus share transfer that did not occur. Wilson submitted a sham share transfer agreement that purported to be between his entity and an Aureus S-1 Shareholder that did not transfer his shares and remains a shareholder today.

54.     Carrillo and Bahadoorsingh, acting in concert with at least each other, began directing sales of their Aureus stock in furtherance of the scheme.

55.     Wintercap sold approximately 4.7 million shares of Aureus for proceeds of approximately $3.0 million in August 2016 through Brokers B, F and G. Broker E also sold approximately 3.4 million shares of Aureus for the Aureus Nominee controlled by Bahadoorsingh for proceeds of approximately $2.2 million during the same period. Carrillo and Bahadoorsingh, working in concert and with others, directed the sales of these Aureus shares.

15

56.     Carrillo and Wintercap personnel communicated via an encrypted messaging application called Threema. Using Threema, Carrillo instructed Wintercap's operators to make particular trades of Aureus (whose ticker symbol was ARSN). For example, on August 5, 2016, Carrillo told Wintercap's operator to "Sell 500k arsn at .50." Soon thereafter, Wintercap's operator informed Carrillo that there is "ARSN big bid 900k @ .495." Carrillo responded "Sell another 1m [million] arsn at .493." At the end of the day, after Wintercap had sold approximately 2.1 million shares of Aureus through Murray Capital, as well as several other securities as directed by Carrillo, Carrillo wrote to Wintercap's operator "this is what u call clicking on all [expletive] cylinders."

57.     It appears that the Aureus Nominees controlled by Wall and Wilson did not have an opportunity to sell their Aureus shares before the market price of Aureus stock declined rapidly after weeks of sales directed by Carrillo and Bahadoorsingh.

58.     At or about the same time that Carrillo and Bahadoorsingh directed the sales of Aureus stock, Carrillo orchestrated a promotional campaign to promote Aureus stock to investors by agreeing to pay the operator of a boiler room based in Medellin, Colombia to call potential investors. Boiler rooms are call centers that typically use high-pressure sales tactics to encourage investors to buy securities, usually penny stocks like Aureus. Carrillo knew that the boiler room he hired would call investors and encourage them to buy Aureus stocks without revealing that they were being paid by the person who owned most of the Aureus stock available for sale or that they stood to profit handsomely from the investors' purchases. Carrillo's efforts to promote Aureus stock led to a significant increase in the price and volume of Aureus's stock in August 2016, as illustrated below:



59.     Carrillo, Bahadoorsingh, Wall and Wilson, by virtue of their control over a significant percentage of Aureus's outstanding shares and its float, were affiliates of Aureus.

60.     At the time that Carrillo and Bahadoorsingh directly or indirectly sold Aureus stock, there was not a registration statement for those sales on file with the Commission or in effect as to those transactions, as required by Section 5 of the Securities Act. Carrillo and Bahadoorsingh also failed to comply with the sale limitations of SEC Rule 144 when directly or indirectly selling Aureus stock.

61.     Carrillo and Bahadoorsingh knew, or were reckless in not knowing, that they were required to register their sales of Aureus stock with the Commission or otherwise comply with the conditions of SEC Rule 144. Carrillo, Bahadoorsingh, Wall and Wilson also knew, or were reckless in not knowing, that their actions in concealing their ownership of Aureus by dividing

that stock into tranches of less than 5% and distributing it to nominee entities would serve to conceal their ownership of that stock, which they and their partners were required to disclose. When they failed to do so, Carrillo, Bahadoorsingh, Wall and Wilson knowingly or recklessly schemed to defraud Aureus investors by concealing information about who was behind the significant sales the group generated. Their state of mind is demonstrated by the actions they took to conceal the ownership of the Aureus shares they controlled. Carrillo's and Bahadoorsingh's state of mind is also demonstrated by their pattern of behavior on similar deals, and their direction of the Aureus trades.

62.     Wintercap's and Broker E's sale of Aureus stock on behalf of Carrillo, Bahadoorsingh and their partners in or about August 2016 generated approximately $5.2 million in illicit proceeds. During August and September 2016, Wintercap transferred at least $1 million from the proceeds of Aureus stock to entities and individuals associated with Carrillo. Similarly, Broker E transferred at least $922,000 of the proceeds of the Aureus stock sales to entities and individuals associated with Carrillo and Bahadoorsingh. The tables below illustrate a number of transfers:

| Payments from Wintercap | Description of Recipient of Payment |
|---|---|
| $455,312 | Mexican pass-through entity linked to Carrillo named Transformaciones y Servicios Industriales SA de CV |
| $304,999 | Mexican stock promotion firm linked to Carrillo named Promotora Prixom SP |
| $200,000 | Defense fees to lawyer representing Carrillo in prior Commission case |
| $75,000 | Business associate of Carrillo and Bahadoorsingh |
| $49,049 | Mexican pass-through entity linked to Carrillo named GPO Kedret SA de CV |
| **Total         $1,084,360** | |

| Payments from Broker E | Description of Recipient of Payment |
|---|---|
| $560,002 | U.S. company controlled by Bahadoorsingh |
| $200,000 | Defense fees to lawyer representing Carrillo in prior |

|  |  | Commission  case |
| --- | --- | --- |
|  | $150,000 | Promotora Prixom SP |
|  | $12,000 | Bahadoorsingh  personal account |
| **Total** | **$922,002** |  |

## **Example 2: Garmatex**

63.     Garmatex was incorporated  in Nevada in April 2014.  During a portion of the Relevant Period, Garmatex's stock was publicly  traded.

64.     Between approximately  August 26 and September 2, 2014, approximately  32 Mexican nationals  purportedly  purchased 1,200,000  shares of Garmatex for a total of $9,000  in a registered securities offering (the "Garmatex S-1 Shareholders").

65.     On or about September 11, 2014, Garmatex's board of directors directed Garmatex's transfer agent to send all of the share certificates purportedly  owned by the Garmatex S-1 Shareholders  to a single  law firm based in Nevada.  The certificates purportedly issued to the Garmatex S-1 Shareholders  were, in reality, controlled  by one or more parties acting in  concert and in control of Garmatex.

66.     On or about August 15, 2016, Garmatex effected a 12.5-for-1 forward split of its common stock which increased the total amount of shares issued to the Garmatex S-1 Shareholders  from 1,200,000  to 15,000,000.

67.     Between about February 28 and March 29, 2017, Carrillo,  acting in concert with others, acquired six blocks (which together totaled 10,250,000  shares) of Garmatex stock from the Garmatex S-1 Shareholders.  Specifically,  Carrillo,  in concert with others, acquired the six blocks of Garmatex shares, in four blocks of 1,750,000  shares and two blocks of 1,625,000 shares, with each block coming from 3 to 5 Garmatex S-1 Shareholders.  Carrillo,  acting in

concert with others, transferred each of the six blocks of shares to a different offshore nominee entity (the "Six Nominees").

68.     In March 2017, Garmatex filed with the Commission a Form 8-K in which it disclosed, among other things, its 5% stockholders. As of March 8, 2017, Garmatex's Form 8-K disclosed that it had approximately 35.4 million outstanding shares. Each of the Six Nominees held just under 5% of Garmatex's stock but, in reality, Carrillo, acting in concert with others, controlled each of the Six Nominees. Garmatex did not disclose the stock held under common control by Carrillo through the Six Nominees, which collectively comprised almost 29% of Garmatex's outstanding stock.

69.     On or about March 13, 15, and 16, 2017, Carrillo, acting in concert with others, orchestrated the transfer of 5,250,000 shares of Garmatex stock from three of the Six Nominees to Wintercap in three equal parts. On or about March 13 and 30, 2017, Carrillo acting in concert with others, orchestrated the transfer of 1,625,000 and 1,750,000 shares of Garmatex stock, respectively, from two of the Six Nominees to Blacklight.  On or about March 16, 2016, Carrillo acting in concert with others, orchestrated the transfer of 1,625,000 shares of Garmatex stock to an account at another broker outside of Wintercap or Blacklight.

70.     On or about the same days, Wintercap and Blacklight deposited the Garmatex shares they held in accounts they controlled at four different brokerage firms (Brokers A, B, C and D) and began selling them in furtherance of the scheme.

71.     In or about April 2017, Carrillo, acting in concert with others, acquired control over about 1,983,337 additional shares of Garmatex, which had been obtained from a number of Garmatex S-1 Shareholders.  Carrillo and his associates then deposited two additional tranches of Garmatex stock with Wintercap (totaling these 1,983,337 shares), most of which Wintercap

subsequently deposited and sold without an effective registration statement in effect. Overall, Carrillo, acting in concert with others, transferred approximately 34% of Garmatex's outstanding stock (and approximately 88% of its float) to Wintercap, Blacklight and another broker outside of Wintercap and Blacklight within just two months.

72.     Carrillo, acting in concert with others, directed the sales of these Garmatex shares.

73.     Using the encrypted Threema messaging application through which they had communicated about Aureus, Carrillo and Wintercap personnel discussed Garmatex shares between at least March 9 and March 23, 2017. On March 9, Carrillo wrote to Wintercap personnel to tell them that one of his associates was sending them documents relating to GRMX (the ticker symbol for Garmatex) and he asked Wintercap to send documents to the transfer agent so that the shares could be deposited promptly and that his request was "Urgent so we can have a good month lol."

74.     On March 14, 2017, Carrillo wrote again to Wintercap confirming that the two Garmatex positions he sent them were just waiting for a few additional documents, and asked Wintercap to be ready to sell the first of those two positions "at open" of the market. When Wintercap responded that 1.75 million shares were ready to sell, Carrillo responded, "Dropping at open yeah baby," and later in the day instructed Wintercap "Sell 25k GRMX at .80."

75.     On March 23, 2017, Carrillo again wrote to Wintercap's operators, asking if they could "take the remaining 3.2 mil shares of GRMX?" Wintercap's operator responded, "Sure, feed me." At the time, 3.2 million shares of Garmatex was nearly 9% of the company's outstanding shares.

76.     By May 15, 2017, Wintercap and Blacklight had sold every share of Garmatex stock that Carrillo had caused to be deposited with them. Those sales were made using the interstate telecommunications facilities of OTC Markets in the United States.

77.     At or about the same time that Carrillo directed the sale of Garmatex stock through Wintercap and Blacklight, Carrillo orchestrated a promotional campaign to encourage investors to purchase Garmatex stock. First, Carrillo agreed to pay the operator of the same Colombia-based boiler room that was used to promote Aureus to call potential investors to promote Garmatex. Certain individuals who reside in Massachusetts received telephone calls as part of the boiler room's promotional campaign touting Garmatex and then purchased the stock of Garmatex. Second, Carrillo directed and sponsored an email promotional campaign to promote Garmatex during the same time period as the boiler room operation. Third, Carrillo paid a public relations consultant based in Canada to draft eight press releases relating to Garmatex during the March and April 2017 period that overlapped with his other promotional efforts. To conceal his involvement in hiring this consultant, Carrillo used code names and encrypted messaging applications to communicate about the press releases. Carrillo's efforts to promote Garmatex stock led to a significant increase in the price and volume of Garmatex's stock in March and April 2017 as shown in the chart below.



78.     Carrillo, by virtue of his control over a significant percentage of Garmatex's outstanding shares and the float, was an affiliate of Garmatex. Carrillo also controlled and directed Garmatex's public relations efforts by arranging to pay, and directing the activities of, persons promoting Garmatex.

79.     At the time that Carrillo directly or indirectly sold Garmatex stock, there was not a registration statement for those sales on file with the Commission or in effect as to those transactions, as required by Section 5 of the Securities Act. Carrillo also failed to comply with the sale limitations of SEC Rule 144 when directly or indirectly selling Garmatex stock. Rule 144 limits the amount of certain securities (like Garmatex) that can be sold by an affiliate to 1% of the issuer's outstanding shares over a three-month period. When multiple affiliates act

together to sell an issuer's shares, their sales are aggregated to determine whether they comply with the 1% requirement.

80. Carrillo formerly operated as a lawyer specializing in the United States federal securities laws. Carrillo thus knew, or was reckless in not knowing, that he was required to register his sales of Garmatex stock with the Commission or otherwise comply with the conditions of SEC Rule 144. Carrillo also knew, or was reckless in not knowing, that his actions in concealing his ownership of Garmatex and other securities by dividing that stock into tranches of less than 5% and distributing it to nominee entities would serve to conceal his ownership of that stock. When he took these actions to facilitate his sales of Garmatex and other securities, Carrillo knowingly or recklessly schemed to defraud Garmatex investors and the investors in those other companies.

81. Carrillo and his partners generated over $7 million in illicit proceeds by selling Garmatex stock through Wintercap and Blacklight during March, April and May 2017. During March and May 2017, Wintercap transferred, on Carrillo's behalf, at least $5.4 million to entities and individuals associated with Carrillo. The table below illustrates some of the larger transfers:

| Payments from Wintercap | Description of Recipient of Payment |
|---|---|
| $1,189,000 | Promotora Prixom SP |
| $723,000 | Transformaciones y Servicios Industriales SA de CV |
| $675,000 | GPO Kedret SA de CV |
| $826,000 | Mexican pass-through entity linked to Carrillo named El Quinto Poder SA de CV |
| $525,850 | California jeweler selling products to Carrillo |
| $134,500 | Payment for BMW X-5 vehicle for Haydee Monge |
| $75,000 | Defense fees to lawyer representing Carrillo in prior Commission case |
| **Total** **$4,148,350** | |

**Example 3: OneLife**

82.     OneLife operated as a publicly traded company at times during the Relevant Period, and was incorporated in Nevada on January 9, 2014.

83.     In or about February 2014, approximately 38 Jamaican nationals purported to purchase 11,367,670 shares of OneLife for a total of about $3,410 (the "OneLife S-1 Shareholders").

84.     On or about March 2, 2018, OneLife registered its securities pursuant to Section 12 of the Exchange Act. That registration was in effect through May 2019.

85.     By January 2017, Carrillo had arranged for all but two of the OneLife S-1 Shareholders' share certificates to be delivered to Wintercap. Wintercap personnel confirmed by an encrypted Threema communication to Carrillo dated January 11, 2017 that Wintercap had the OneLife share certificates, including the share certificate for 35 million shares purportedly held by OneLife's CEO.

86.     On January 16, 2017, Carrillo emailed Wintercap personnel a blank Share Purchase Agreement for the sale of OneLife stock with blanks to fill in the names of the purchasers and sellers and the purchase prices. Attached to the same email message were signature pages for that Share Purchase Agreement that were purportedly signed by 35 of the OneLife S-1 Shareholders as sellers but with blanks for the purchasers. It appears that Wintercap and Carrillo worked together to determine how to divide the OneLife S-1 Shareholders' shares between the nominee entities through which they intended to sell these shares for Carrillo.

87.     On or about June 13, 2017, OneLife effected a 2-for-1 forward split of its common stock which increased the total amount of shares issued to the 38 OneLife S-1 Shareholders from 11,367,670 to 22,735,340.

88.     Beginning in June 2017, OneLife's transfer agent was informed about several transfers of shares from the OneLife S-1 Shareholders to entities controlled by Carrillo. These transfers were accomplished using the Share Purchase Agreements that Carrillo had sent to Wintercap in January 2017. Specifically, in or about June 2017, Carrillo directly or indirectly acquired a block of 4,366,670 shares of OneLife from seven OneLife S-1 Shareholders, and a second block of 4,666,668 shares of OneLife from eight additional OneLife S-1 shareholders. Later, in or about September 2017, Carrillo directly or indirectly acquired a third block of 4,132,000 shares of OneLife from seven additional OneLife S-1 Shareholders. Carrillo, directly or indirectly, held each block of OneLife stock in a separate offshore nominee (the "OneLife Nominees").

89.     The second of these three blocks of OneLife shares (4,666,668 shares) was acquired by a nominee entity named Compton Capital. Compton Capital was one of the nominees that Carrillo asked Wintercap personnel to create for his use to hold and dispose of penny stocks (as discussed in paragraph 39 above).

90.     In total, Carrillo directly or indirectly acquired approximately 13.1 million shares of OneLife stock between June and September 2017. As of the end of October 2017, OneLife had approximately 92,735,340 shares outstanding (5% of which was approximately 4,636,767 shares). Carrillo thus held about 14% of OneLife's outstanding shares. In December 2017, a share cancellation reduced OneLife's outstanding shares to 62,985,340 shares.

91.     Section 13(d) of the Exchange Act and the Commission's rules promulgated thereunder require individuals acting alone or in a group to file reports with the Commission, which are available to investors, when those shareholders acquire more than 5% of the

outstanding stock of a company registered under Section 12. OneLife was a company registered under Section 12 as of March 2018.

92.     Carrillo formerly operated as a lawyer specializing in the United States federal securities laws. Carrillo knew about and understood, or recklessly disregarded, Section 13(d) of the Exchange Act, and his obligations under that statute to disclose his direct or indirect ownership of more than 5% of OneLife's outstanding shares.

93.     Carrillo, acting in concert with others, controlled the OneLife Nominees. As a result, through the OneLife Nominees, Carrillo was the beneficial owner, alone or in a group with others, of more than 5% of OneLife's publicly traded stock and he was required to disclose that interest. Carrillo failed to disclose his beneficial ownership status as required by Section 13(d) of the Exchange Act.

94.     Between June and September 2017, Carrillo, directly or indirectly and operating through the OneLife Nominees, orchestrated the transfer of all three blocks of OneLife shares he controlled to Wintercap. By the end of September, these three blocks of stock that Carrillo had directed to Wintercap comprised about 14% of OneLife's outstanding shares, and about 92% of OneLife's float.

95.     On or about the same days, Wintercap deposited the three blocks of OneLife shares it received into accounts it controlled at Brokers A, B and H. Wintercap, acting directly or indirectly on instructions from Carrillo, began selling it in furtherance of the scheme. The Compton Capital shares deposited with Broker H were broken into smaller blocks of under 5% each, and sent to other brokers to be traded.

96.     Carrillo used the same encrypted application that he had used to communicate with Wintercap's operators about Garmatex and Aureus to communicate about OneLife (whose

ticker symbol was OLMM).  On August 31, 2018, using that application, Carrillo expressed concern that Wintercap might run out of OneLife shares, and he inquired about the status of getting another block of shares to Wintercap.  On August 31, 2018, Wintercap sold 1.08 million shares of OneLife at Carrillo's direction through two of the OneLife Nominees.  On September 25, 2018, using the same application, Carrillo directed Wintercap to sell OneLife shares in multiple blocks.  At the end of the trading day, Wintercap personnel wrote to Carrillo to report "sold 334,000 OLMM @ $0.566 average."  In fact, on September 25, 2018, Wintercap sold exactly 334,000 shares of OneLife through its account at Broker B on behalf of one of the OneLife Nominees.

97.     Similarly, on September 27, 2018, through the same encrypted application, Carrillo instructed Wintercap to sell 400,000 shares of OLMM at $0.627.  Wintercap's operator responded that he would split the order.  In fact, on September 27, 2018, Wintercap sold exactly 400,000 shares of OLMM: 250,000 shares through one of its brokerage accounts on behalf of one of the OneLife Nominees, and 150,000 shares through its account with Broker B on behalf of another OneLife Nominee.

98.     In total, Wintercap sold approximately 7.5 million shares of OneLife for proceeds of approximately $5.25 million between November 2017 and October 2018.  Carrillo directed the sales of these OneLife shares.

99.     Carrillo, by virtue of his control over a significant percentage of OneLife's outstanding shares and the float, was an affiliate of OneLife.  Carrillo also controlled and directed OneLife's public relations efforts by arranging to pay, and directing the activities of, a public relations consultant based in Canada.  Carrillo used encrypted messaging applications and

code names to communicate with the consultant.  The consultant drafted five press releases for OneLife between January and February 2018.

100.    At the time that Carrillo directly or indirectly sold OneLife stock, there was not a registration statement for those sales on file with the Commission or in effect as to those transactions, as required by Section 5 of the Securities Act.  Carrillo also failed to comply with the sale limitations of SEC Rule 144 when directly or indirectly selling OneLife stock.

101.    Carrillo knew, or was reckless in not knowing, that he was required to register his sale of OneLife stock with the Commission or otherwise comply with the conditions of SEC Rule 144.  He also knew, or was reckless in not knowing, that he was required to disclose his ownership interest in OneLife stock.  When he failed to do so, Carrillo knowingly or recklessly schemed to defraud OneLife investors by concealing information about who was behind the significant sales he orchestrated through Wintercap's brokerage accounts.

102.    Wintercap's sale of OneLife stock on behalf of Carrillo and his partners between November 2017 and October 2018 generated over $5.25 million in illicit proceeds. Between January and September 2018, Wintercap transferred, on Carrillo's behalf, at least $2.88 million to entities and individuals associated with Carrillo.

| Payments from Wintercap | Description of Recipient of Payment |
|---|---|
| $882,500 | Mexican pass-through entity linked to Carrillo named Bufet Corporative y Aduanero Khaliq SA de CV |
| $690,000 | Mexican pass-through entity linked to Carrillo named Comercializadora Anairda SA de CV |
| $529,000 | Mexican pass-through entity linked to Carrillo named Fuze Construcciones SA de CV |
| $464,010 | California jeweler selling products to Carrillo |
| $250,000 | Payments for home improvements on Chula Vista property owned by Martha Y. Jimenez Trust |
| $65,000 | Payments for home improvements on Chula Vista property owned by Martha Y. Jimenez Trust |

| Total | $2,880,510 |
|-------|------------|

### Additional Publicly Traded Companies Dumped by Carrillo

103.    In addition to the stock of Aureus, Garmatex and OneLife, Carrillo, acting in concert with others, sold the stock of numerous other publicly traded companies without an exemption from registration, or effective registration in effect with the Commission, pursuant to Section 5 of the Securities Act during the Relevant Period.

104.    The table set forth below in this paragraph identifies examples, without limitation, of sales for which no effective registration statement was filed or in effect. For each example in that table, Carrillo, directly or indirectly, transferred unregistered stock to Wintercap, Blacklight, or other intermediaries, which these entities then sold after depositing the unregistered stock with brokers. By doing so, Carrillo was acting as the issuer by virtue of his control over, at a minimum, a significant percentage of the shares available for trading in the following companies. In these examples, as in the Garmatex example above, Carrillo, working with others, typically divided the stock he controlled so each nominee owner possessed less than 5% of the issuer's outstanding stock. The "Shares Available for Trading" in the table below indicates the number of shares that had been deposited with brokers and were thus available for trading in the market. On each occasion, no registration exemption applied, and Carrillo failed to comply with the conditions of SEC Rule 144.

| Issuer | Date of First Transfer to Carrillo Group | Cumulative Carrillo Group Shares Available for Trading | Total Shares Available for Trading As of Last Carrillo Group Deposit | Carrillo Group Percentage of Shares Available for Trading | Minimum Gross Proceeds to Carrillo Group |
|---|---|---|---|---|---|
| ORRP | 12/9/2015 | 15,000,000 | 15,000,000 | 100.0% | $ 13,147,920 |
| DVGG / RETC | 6/13/2017 | 18,366,018 | 18,416,592 | 99.7% | $ 9,547,455 |
| CATQ / FTWS | 10/19/2015 | 15,000,000 | 15,000,000 | 100.0% | $ 9,234,303 |
| GRMX | 3/13/2017 | 12,233,337 | 13,858,334 | 88.3% | $ 7,044,571 |
| DIGAF | 9/7/2016 | 18,160,000 | 18,581,781 | 97.7% | $ 5,578,484 |
| OLMM | 6/2/2017 | 13,165,338 | 14,298,670 | 92.1% | $ 5,253,994 |
| ARSN | 7/28/2016 | 18,375,000 | 21,150,000 | 86.9% | $ 5,185,301 |
| MTUU | 9/2/2016 | 8,135,000 | 8,135,000 | 100.0% | $ 2,379,945 |
| PSNX | 5/6/2013 | 48,000,000 | 48,000,000 | 100.0% | $ 1,392,662 |
| **TOTAL** | | | | | $ 58,764,635 |

105.    With respect to at least three of the securities listed in the table above, PSNX (PureSnax International Inc.), CATQ/FTWS (Flitways Technology Inc.) and ORRP (Oroplata Resources Inc.), Carrillo hired the same boiler room based in Medellin, Colombia that he hired to promote both Garmatex and Aureus securities.  Carrillo thus took advantage of the promotional calls made by the boiler room to unsuspecting retail investors to increase the demand for those securities that he and his associates, who controlled their float, wanted to sell.

106.    The Commission's Rule 144 limits the volume of securities legally able to be sold for the account of an issuer's "affiliate" during a three month time period to the greater of: a) 1 percent of the shares of the class of outstanding stock as shown by the most recent report or statement published by the issuer, or b) the average weekly reported volume of trading in those securities.

107.    On numerous occasions, Carrillo and his partners, including Bahadoorsingh at least with respect to Aureus, sold more than 1 percent of a class of an issuer's shares in less than 3 months (indeed sometimes even in one day) while they were affiliates of that issuer.  The following table provides several examples of this conduct:

| Issuer | Shares Outstanding | 1% Threshold | 1% Test Period | Shares Sold During Test Period | Percent |
|--------|-------------------|--------------|----------------|-------------------------------|---------|
| FTWS | 30,000,000 | 300,000 | 9/7/2016 | 700,000 | 2.33% |
| RETC | 75,692,024 | 756,920 | 6/27/2017 - 6/30/2017 | 905,100 | 1.20% |
| GRMX | 35,627,934 | 356,279 | 3/14/2017 | 2,625,000 | 7.37% |
| OLMM | 62,985,340 | 629,853 | 3/22/2018 - 3/27/2018 | 731,485 | 1.16% |
| ARSN | 126,450,000 | 1,264,500 | 8/4/2016 | 2,020,000 | 1.60% |
| ORRP | 57,136,934 | 571,369 | 6/7/2016 - 6/9/2016 | 623,000 | 1.09% |
| DIGAF | 42,909,650 | 429,097 | 11/1/2016 | 1,576,000 | 3.67% |
| MTUU | 30,000,000 | 300,000 | 2/12/2018 | 740,000 | 2.47% |

### Monetary Transfers to the Relief Defendants

108.    Defendant Carrillo transferred, directly or indirectly, millions of dollars of trading proceeds from the fraudulent conduct described above to the Relief Defendants for no legitimate purpose or consideration.

109.    In or about April 2017, Carrillo directed Wintercap to transfer $134,500 derived from fraudulent securities sales to a car dealership to purchase a BMW X5 automobile that was titled in the name of Monge as its owner. Wintercap funded the payment from one of the offshore nominees it created for Carrillo's personal use. Though Monge is the purported owner of that automobile, the insured party listed on the vehicle's insurance policy is Carrillo himself.

110.    Between January 2017 and June 2018, Carrillo transferred at least $605,500 sourced from the fraudulent trading proceeds described above to fund improvements on the house located at 2908 Gate Five Place, Chula Vista, California. The record co-owners of that home are the Martha Y. Jimenez Trust and the Charles A. Carrillo Trust. Martha Y. Jimenez is defendant Carrillo's mother and Charles A. Carrillo is a relative of defendant Carrillo. Land records for the house indicate that the Martha Y. Jimenez Trust and the Charles A. Carrillo Trust are absentee owners.

## FIRST CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Sections 17(a)(1) and (3) of the Securities Act by Carrillo, Bahadoorsingh, Wall and Wilson)

111. Paragraphs 1 through 110 above are re-alleged and incorporated by reference as if fully set forth herein.

112. During the Relevant Period, the stock of Garmatex, Aureus and OneLife was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

113. By reason of the conduct described above, defendants Carrillo, Bahadoorsingh Wall and Wilson, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

114. By reason of the conduct described above, defendants Carrillo, Bahadoorsingh, Wall and Wilson violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

## SECOND CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violation of Sections 17(a)(2) of the Securities Act by Wall and Wilson)

115. Paragraphs 1 through 110 above are re-alleged and incorporated by reference as if fully set forth herein.

116. During the Relevant Period, the stock of Garmatex, Aureus and OneLife was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

117.    By reason of the conduct described above, defendants Wall and Wilson, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

118.    By reason of the conduct described above, defendants Wall and Wilson violated Securities Act Section 17(a)(2) [15 U.S.C. §77q(a)(2)] and will continue to violate that section unless enjoined.

### THIRD CLAIM FOR RELIEF
### <u>FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES</u>
### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder by Carrillo, Bahadoorsingh, Wall and Wilson)

119.    Paragraphs 1 through 110 above are re-alleged and incorporated by reference as if fully set forth herein.

120.    During the Relevant Period, the stock of Garmatex, Aureus and OneLife was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)].

121.    By reason of the conduct described above, defendants Carrillo, Bahadoorsingh Wall and Wilson, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities. By reason of the conduct described above, defendants Carrillo, Bahadoorsingh,

Wall and Wilson violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

## FOURTH CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder by Wall and Wilson)**

122.   Paragraphs 1 through 110 above are re-alleged and incorporated by reference as if fully set forth herein.

123.   During the Relevant Period, the stock of Garmatex, Aureus and OneLife was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)].

124.   By reason of the conduct described above, defendants Wall and Wilson, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

125.   By reason of the conduct described above, defendants Wall and Wilson violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)] thereunder.

## FIFTH CLAIM FOR RELIEF
## UNREGISTERED OFFERINGS OF SECURITIES
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Carrillo and Bahadoorsingh)**

126.   Paragraphs 1 through 110 above are re-alleged and incorporated by reference as if fully set forth herein.

127.     During the Relevant Period, the stock of Garmatex, Aureus and OneLife was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

128.     By reason of the conduct described above, defendants Carrillo and Bahadoorsingh, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

129.     As a result, defendants Carrillo and Bahadoorsingh violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

## SIXTH CLAIM FOR RELIEF
## FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP
### (Violations of Sections 13(d) of the Exchange Act by Carrillo, Bahadoorsingh, Wilson and Wall)

130.     Paragraphs 1 through 110 above are re-alleged and incorporated by reference as if fully set forth herein.

131.     During the Relevant Period, the stock of Aureus and OneLife was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)].

132.     During the Relevant Period, Aureus and OneLife had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

133.   By reason of the conduct described above, defendants Carrillo, Bahadoorsingh, Wilson and Wall, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of Aureus equity securities, failed to file a statement with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they acquired such shares, or at all.

134.   By reason of the conduct described above, defendant Carrillo, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of OneLife equity securities, failed to file a statement with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after he acquired such shares, or at all.

135.   As a result, defendants Carrillo, Bahadoorsingh, Wilson and Wall violated Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)].

**SEVENTH CLAIM FOR RELIEF**
**OTHER EQUITABLE RELIEF, INCLUDING UNJUST ENRICHMENT AND**
**CONSTRUCTIVE TRUST**
**(against Relief Defendants)**

136.   Paragraphs 1 through 110 above are re-alleged and incorporated by reference as if fully set forth herein.

137.   Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

138.   The Relief Defendants have received investor funds derived from the unlawful acts, practices and scheme of the Defendants under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

139.    Further, specific property acquired or improved by the Relief Defendants is traceable to Defendants' wrongful acts, and there is no reason in equity why the Relief Defendants should be entitled to retain that property.

140.    As a result, the Relief Defendants are liable for unjust enrichment and should be required to return their ill-gotten gains, in an amount to be determined by the Court. The Court should also impose a constructive trust on property in the possession of the Relief Defendants that is traceable to the Defendants' wrongful acts.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.    Enter a permanent injunction restraining defendants Carrillo and Bahadoorsingh, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and (c), and 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§77e(a), (c); 77q(a)(1) and (3)], and Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§78j(b), 78m(d)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5(a) and (c)].

B.    Enter a permanent injunction restraining defendants Wilson and Wall, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§77q(a)(1)-(3)], and Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§78j(b), 78m(d)] and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §240.10b-5(a)-(c)].

C.      Order the defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)].

D.      Order the defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

E.      Enter an order barring defendants Bahadoorsingh, Wall and Wilson from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

F.      Order the Relief Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in the Complaint;

G.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

H.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED: August 4, 2021                     Respectfully submitted,

/s/ Kathleen B. Shields
Kathleen B. Shields (Mass Bar No. 637438)
Eric A. Forni (Mass Bar No. 669685)
Susan Anderson (DC Bar No. 978173)
Amy Gwiazda (Mass Bar No. 663494)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct),
(617) 573-8827 (Forni direct)
(617) 573-4538 (Anderson direct)
Fax: (617) 573-4590 (fax)

ShieldsKa@sec.gov (Shields email)
ForniE@sec.gov (Forni email)
AndersonSu@sec.gov (Anderson email)