UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>      Plaintiff,<br> v.<br>LUIS JIMENEZ CARRILLO, AMAR BAHADOORSINGH, JUSTIN ROGER WALL, and JAMIE SAMUEL WILSON,<br>      Defendants,<br>and<br>HAYDEE YOLANDA SANCHEZ DIAZ MONGE, MARTHA Y. JIMENEZ TRUST, and CHARLES A. CARRILLO TRUST,<br>      Relief Defendants. | Civil Action No. 21-cv-11272-WGY |

## DECLARATION OF TREVOR T. DONELAN

I, Trevor T. Donelan, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1. Since September 2014, I have been employed as a Senior Enforcement Accountant with the Securities and Exchange Commission ("the Commission"). My duties include conducting investigations relating to potential violations of the federal securities laws.

2. I received a Bachelor of Science degree in business administration, with a concentration in accounting, from the University of Richmond in Virginia in 2000. Before joining the Commission, I was a managing director in the forensic accounting and complex business litigation unit at StoneTurn Group, LLP for over seven years. Before that, I held forensic accounting and auditor positions for about seven years with other firms.

3. I am a Certified Public Accountant in the Commonwealth of Massachusetts, and a Certified Fraud Examiner by the Association of Certified Fraud Examiners. I am also certified in Financial Forensics by the American Institute of Certified Public Accountants.

4. I make this declaration based upon my personal knowledge and upon information and belief as set forth below, and in support of the Commission's Motion for an Order Freezing Assets and for Other Equitable Relief.

5. In or about 2017, I became actively involved in the Commission's investigation into possible violations of the federal securities laws by the defendants subject to the Complaint in this matter.

6. During that investigation, I reviewed documents and data produced to the Commission and attended witness interviews and testimony. This declaration relays information gathered through those witnesses and documents.

7. The principal sources of documentation produced to the Commission that I have relied upon for this declaration include, but are not limited to:

    a. Transfer agent records for certain public company issuers held by and/or traded by Luis Carrillo ("Carrillo") and those working in concert with him.

    b. Trading data collected by the Commission for certain public company issuers held by and/or traded by Carrillo and those working in concert with him ("Blue Sheet Data").

    c. Brokerage records for accounts held at both United States and foreign broker-dealers through which the securities at issue in the Complaint were traded, including firms identified as Brokers A through G in the Complaint.

  d. Banking records for accounts held at foreign banks in the names of entities that Carrillo appears to have controlled and used for his benefit, and accounts controlled and used by Wintercap SA and Blacklight SA, including accounts at Scotiabank Inverlat, Banorte, BBVA Bancomer, Banco Santander, Banca Inbursa, and Banamex and accounts administered by payment processor WB21 Pte.

  e. Communications between Carrillo and the operators of Wintercap SA.

  f. Publicly available information including filings made to the Commission and OTC Markets Group ("OTC Markets"), and public information regarding the market price and trading volume of certain securities.

  g. Brokerage records from other relevant accounts (for example, retail purchasers of the securities dumped by the defendants).

  h. Documents from third parties including entities engaged in promotional and public relations activities.

  i. FINRA referrals, investigative files and Form 15c211 applications.

  j. Documents produced to the Commission during the course of its investigation by various third parties, including a significant amount of information collected from Curacao reflecting an accounting system and communications network maintained by a group that provided these services to Carrillo.

  8. Counsel for the Commission has asked me to summarize some of the transactions that Carrillo and his business partners directed, including: (a) the receipt, deposits and sale of certain public companies' stock, including Aureus, Inc. ("Aureus") and Garmatex Holdings Ltd. ("Garmatex"); and (b) the movement of cash from Wintercap SA and Blacklight SA bank and brokerage accounts to accounts controlled by, or used for the

benefit of, Carrillo and his business partners.

9. To the extent I refer to my "understanding" herein, that understanding is based on my review of the evidence collected in the investigation that led to the filing of this case.

10. To date, as a result of the trading described in the Complaint, I have been able to identify more than $75 million in trading proceeds generated by Carrillo and his business partners' sales of more than 30 penny stocks.

**Carrillo's Trading in Multiple Penny Stocks**

11. I reviewed records obtained from transfer agents for several public company issuers whose stock was held by and traded by Carrillo, working with various of his business partners (the "Carrillo Group").

12. For the issuers whose trading symbols are listed in the table in paragraph 13 below, using the transfer agent records, I was able to trace the transfer of shares into the Carrillo Group's control. The nine issuers listed in this chart are only a subset of the issuers involved in the Carrillo Group's schemes. In these examples, Carrillo, or others working with him or at his direction, typically divided the stock his group controlled so each nominee shareholder possessed less than 5% of the issuer's outstanding stock. The table shows the date that shares were first transferred to the Carrillo Group, and the total number of shares transferred to them. Carrillo, or others working with him or at his direction, would then typically transfer his group's shares to Wintercap SA, Blacklight SA, or another intermediary, who would then deposit the Carrillo Group's stock into brokerage accounts they directed, in blocks of less than 5% of each company's outstanding shares. Working with Wintercap SA, Blacklight SA, or another intermediary, Carrillo, or others working with

him or at his direction, would ensure that the Carrillo Group's shares were converted into electronic format by depositing the certificates with the Depository Trust & Clearing Corporation ("DTCC"). Once the Carrillo Group's shares were deposited with DTCC, they were available to be traded electronically ("Shares Available for Trading").

13. I also used the records obtained from the transfer agents to determine the balance of Shares Available for Trading as of the Carrillo Group's latest deposit to DTCC, and I calculated the percentage of Shares Available for Trading controlled by the Carrillo Group.

14. Finally, using records obtained from brokerage and bank accounts administered by Wintercap SA and Blacklight SA and other brokerage accounts controlled by the Carrillo Group, I calculated the trading proceeds generated by the Carrillo Group from selling stock in these nine example issuers, which approximated $58.7 million in the aggregate. This estimate represents the minimum amount of proceeds for these nine issuers because there may have been Carrillo Group-directed sales through brokerage accounts for which the Commission has not yet received complete trading records.

| Issuer | Date of First Transfer to Carrillo Group | Cumulative Carrillo Group Shares Available for Trading | Total Shares Available for Trading As of Last Carrillo Group Deposit | Carrillo Group Percentage of Shares Available for Trading | Minimum Gross Proceeds to Carrillo Group |
|---|---|---|---|---|---|
| ORRP | 12/9/2015 | 15,000,000 | 15,000,000 | 100.0% | $ 13,147,920 |
| DVGG / RETC | 6/13/2017 | 18,366,018 | 18,416,592 | 99.7% | $ 9,547,455 |
| CATQ / FTWS | 10/19/2015 | 15,000,000 | 15,000,000 | 100.0% | $ 9,234,303 |
| GRMX | 3/13/2017 | 12,233,337 | 13,858,337 | 88.3% | $ 7,044,571 |
| DIGAF | 9/7/2016 | 18,160,000 | 18,581,781 | 97.7% | $ 5,578,484 |
| OLMM | 6/2/2017 | 13,165,338 | 14,298,670 | 92.1% | $ 5,253,994 |
| ARSN | 7/28/2016 | 18,375,000 | 21,150,000 | 86.9% | $ 5,185,301 |
| MTUU | 9/2/2016 | 8,135,000 | 8,135,000 | 100.0% | $ 2,379,945 |
| PSNX | 5/6/2013 | 48,000,000 | 48,000,000 | 100.0% | $ 1,392,662 |
| TOTAL | | | | | $ 58,764,635 |

15. For each of the issuers listed in the table above, I searched filings made with the Commission and found that no person or entity associated with the issuers filed any Forms 144. For these nine issuers, I also searched the public filings, including registration statements, for the names of Carrillo and the nominee entities though which the Carrillo Group sold stock of the above issuers. The purpose of my search was to assess whether any public registration statements disclosed the names of those entities, or their control persons, as selling shareholders. I did not observe any of the entities or the control persons subject to my search in the filings of the companies listed in the table above.

16. My understanding based on various documents and witness interviews compiled during this investigation is that Carrillo hired a boiler room based in Medellin, Colombia to promote the shares of at least five of the issuers listed in the table in paragraph 13: Aureus (ARSN), Garmatex (GRMX), Flitways Technology Inc. (CATQ/FTWS), Oroplata Resources Inc. (ORRP) and PureSnax International Inc. (PSNX).

17. On numerous occasions, Carrillo and the Carrillo Group, including Bahadoorsingh at least with respect to Aureus, sold more than 1 percent of a class of an issuer's shares in less than 3 months (indeed sometimes even in one day). The following table provides several examples of this conduct:

| Issuer | Shares Outstanding | 1% Threshold | 1% Test Period | Shares Sold During Test Period | Percent |
|---|---|---|---|---|---|
| CATQ / FTWS | 30,000,000 | 300,000 | 9/7/2016 | 700,000 | 2.33% |
| DVGG / RETC | 75,692,024 | 756,920 | 6/27/2017 - 6/30/2017 | 905,100 | 1.20% |
| GRMX | 35,627,934 | 356,279 | 3/14/2017 | 2,625,000 | 7.37% |
| OLMM | 62,985,340 | 629,853 | 3/22/2018 - 3/27/2018 | 731,485 | 1.16% |
| ARSN | 126,450,000 | 1,264,500 | 8/4/2016 | 2,020,000 | 1.60% |
| ORRP | 57,136,934 | 571,369 | 6/7/2016 - 6/9/2016 | 623,000 | 1.09% |
| DIGAF | 42,909,650 | 429,097 | 11/1/2016 | 1,576,000 | 3.67% |
| MTUU | 30,000,000 | 300,000 | 2/12/2018 | 740,000 | 2.47% |

**The Aureus Scheme**

18. I have reviewed the transfer agent records for Aureus. Those records indicate that, between April and August 2016, the transfer agent issued approximately 25,275,000 million shares of Aureus to seven foreign nominee entities (the "Aureus Nominees") that were controlled by Carrillo, Bahadoorsingh, Wall and Wilson. Attached as Exhibit 6 hereto is a flow chart showing the transfer of Aureus shares described in detail in the Complaint.

19. It is my understanding that one of the Aureus Nominees, Murray Capital Corp., was created by Wintercap personnel at the request of Carrillo for Carrillo's use to hold and dispose of penny stocks.

20. Based on publicly available data and transfer agent records, Aureus had about 126,450,000 shares outstanding in August 2016. The 25,275,000 shares controlled by Carrillo, Bahadoorsingh, Wall and Wilson was thus about 20% of Aureus' outstanding shares. By August 2016, Carrillo, Bahadoorsingh, Wall and Wilson had deposited 21,000,000 of their shares with brokers, which represented approximately 81% of the total Aureus Shares Available for Trading.

21. Attached as Exhibits 1-3 are excerpts of documents obtained by the Commission concerning the Aureus Nominees controlled by Wall and Wilson, which have been redacted to remove full account numbers and other personal identifying information: Palletcore Ltd. (Exhibit 1), Cityhawk Ltd. (Exhibit 2), and Common Sense Holdings Ltd. (Exhibit 3). These documents demonstrate that Wall controlled Palletcore Ltd. and Wilson controlled Cityhawk Ltd. and Common Sense Holdings Ltd.

22. I have reviewed transfer agent records and brokerage records showing that between July 28 and August 17, 2016, Carrillo, Bahadoorsingh, Wall and Wilson

coordinated the transfer of Aureus shares from the Aureus Nominees into brokerage accounts where they could be sold. Carrillo personally orchestrated the transfer of Aureus shares from three of the Aureus Nominees to Wintercap SA, which deposited them with Brokers B, G, and F. Three of the other Aureus Nominees, controlled one each by Bahadoorsingh, Wall and Wilson, deposited their Aureus shares with Broker E.

23. Attached as Exhibit 4 is a transcript of chat communications that took place on an encrypted messaging application called Threema between Carrillo and the operator(s) of Wintercap SA in August 2016. My understanding is that the user identified as "Spartacus" is Carrillo, the user identified as "Arrow" is Roger Knox, the operator of Wintercap, and the user identified as "Silvereagle" is Richard Targett-Adams, another employee of Wintercap. These chats show Carrillo personally directing trades in Aureus stock.

24. Below is a chart based on publicly-available trading data that summarizes the market price and volume for Aureus shares from June 1, to September 30, 2016.



25.    Based on the brokerage records I have reviewed, Wintercap SA sold approximately 4.7 million shares of Aureus for proceeds of approximately $3.0 million in August 2016 through Brokers B, F and G.  Broker E also sold approximately 3.4 million shares of Aureus for the Aureus Nominee controlled by Bahadoorsingh for proceeds of approximately $2.2 million during the same period.

**The Garmatex Scheme**

26.    I have reviewed the transfer agent records for Garmatex.  Those records indicate that, between February and March 2017, Carrillo and his associates acquired control over approximately 10,250,000 million shares of Garmatex through six foreign nominee entities (the "Garmatex Nominees").

27.    Each of the Garmatex Nominees held just under 5% of Garmatex's stock,

but, together, they held almost 29% of Garmatex's outstanding stock.

28. The transfer agent records and brokerage account records that I have reviewed indicate that in March 2017, Carrillo, acting in concert with others, orchestrated the transfer of a total of 5,250,000 shares of Garmatex stock from three of the Garmatex Nominees to Wintercap SA. The records also show that, on or about March 13 and 30, 2017, Carrillo acting in concert with others, orchestrated the transfer of a total of 3,375,000 shares of Garmatex stock, respectively, from two of the Garmatex Nominees to Blacklight SA. The records further show that, on or about March 16, 2016, Carrillo acting in concert with others, orchestrated the transfer of 1,625,000 shares of Garmatex stock to an account at another broker outside of Wintercap or Blacklight.

29. In April 2017, Carrillo and his associates acquired control over an additional approximately 1,983,337 shares of Garmatex, which had been obtained from a number of S-1 shareholders, and transferred those additional shares to Wintercap SA. In total, Carrillo and his associates transferred about 34% of Garmatex's outstanding stock, and about 88% of the cumulative Shares Available for Trading, to Wintercap SA, Blacklight SA and another broker within a two month time period.

30. Attached as Exhibit 5 is a transcript of chat communications that took place on an encrypted messaging application called Threema between Carrillo and the operator(s) of Wintercap SA in March 2017. My understanding is that the user identified as "Spartacus17" is Carrillo, the user identified as "Arrow777" is Roger Knox, the operator of Wintercap, and the user identified as "SilverWags" is Richard Targett-Adams, another employee of Wintercap. These chats show Carrillo personally directing trades in Garmatex stock.

31. By May 15, 2017, Wintercap and Blacklight had sold every share that Carrillo had caused to be deposited with them. In total, those sales generated over $7 million in proceeds between March and May 2017.

32. During the period of time that Wintercap SA and Blacklight SA were selling Carrillo and his associates' Garmatex stock, I am aware of documents demonstrating that Carrillo was paying to promote Garmatex, both through the boiler room located in Colombia and through an email campaign. Certain individuals who reside in Massachusetts received telephone calls as part of the boiler room's promotional campaign touting Garmatex and then purchased the stock of Garmatex.

33. During March and April 2017, Carrillo also paid a public relations consultant based in Canada to draft eight press releases relating to Garmatex. Documents produced to the Commission on behalf of the public relations consultant indicated that Carrillo used code names and encrypted messaging applications to communicate about the press releases, and stated that the communications about the Garmatex press releases were deleted following each job at Carrillo's request.

34. Below is a chart based on publicly-available trading data that summarizes the market price and volume for Garmatex shares from February 1 to May 2, 2017:



**Carrillo's Financial Benefit from Trading In Aureus and Garmatex**

35. I have reviewed bank, and brokerage records relating to both Wintercap SA's distribution of the proceeds of its trading in Aureus and Garmatex shares. I also reviewed brokerage records showing Broker E's distribution of the proceeds of Carrillo's trading in Garmatex shares. The following charts summarize those transfers.

36. In August and September 2016, Wintercap SA and Broker E transferred more than $1.9 million (of the $5.2 million) in illicit proceeds from the defendants' sale of Aureus stock to entities and individuals associated with Carrillo:

| Payments from Wintercap | Description of Recipient of Payment |
|---|---|
| $455,312 | Mexican pass-through entity linked to Carrillo named Transformaciones y Servicios Industriales SA de CV |

12

| Payments from Wintercap | Description of Recipient of Payment |
|---:|---|
| $304,999 | Mexican stock promotion firm linked to Carrillo named Promotora Prixom SP |
| $200,000 | Defense fees to lawyer representing Carrillo in prior Commission case |
| $75,000 | Business associate of Carrillo and Bahadoorsingh |
| $49,049 | Mexican pass-through entity linked to Carrillo named GPO Kedret SA de CV |
| **Total** | **$1,084,360** |

| Payments from Broker E | Description of Recipient of Payment |
|---:|---|
| $560,002 | U.S. company controlled by Bahadoorsingh |
| $200,000 | Defense fees to lawyer representing Carrillo in prior Commission case |
| $150,000 | Promotora Prixom SP |
| $12,000 | Bahadoorsingh personal account |
| **Total** | **$922,002** |

37. In March and May 2017, Wintercap transferred at least $5.4 million (of $7 million) in trading proceeds from the sale of Carrillo's Garmatex stock to entities and individuals associated with Carrillo. The table below illustrates some of the larger transfers:

| Payments from Wintercap | Description of Recipient of Payment |
|---:|---|
| $1,189,000 | Promotora Prixom SP |
| $723,000 | Transformaciones y Servicios Industriales SA de CV |
| $675,000 | GPO Kedret SA de CV |
| $826,000 | Mexican pass-through entity linked to Carrillo named El Quinto Poder SA de CV |
| $525,850 | California jeweler selling products to Carrillo |
| $134,500 | Payment for BMW X-5 vehicle for Haydee Monge |
| $75,000 | Defense fees to lawyer representing Carrillo in prior Commission case |
| **Total** | **$4,148,350** |

38. In addition to the companies identified in the tables in paragraphs 36 and 37

13

above, my review of bank records indicates the following companies directly or indirectly received funds that originated in fraudulent trading proceeds earned by Carrillo. Specifically, three companies, Estructura Internacional de la Construccion SA de CV, Mantenimiento Mecanico Lenox SA de CV, and Servicios de Limpieza Datop SA de CV, received wires of trading proceeds from Carrillo's account at a trading intermediary he used. Another two companies, Brapel Constructores SA de CV, and Ojorm Administrativos SA de CV, received proceeds from trading in issuers in which Carrillo's trading intermediary recorded him as the "owner" of the deal. Finally, another two companies, Integradora Morka Sindicato Patronal and Rikium Internacional SP, received money from other Carrillo nominees and show transactions in their accounts that directly benefitted Carrillo.

39.    Between January 2017 and June 2018, Carrillo transferred at least $605,500 sourced from the trading proceeds from sales of the tickers listed in paragraph 13 to fund improvements on the house located at 2908 Gate Five Place, Chula Vista, California. The record co-owners of that home are trusts in the names of Carrillo's relatives: the Martha Y. Jimenez Trust and the Charles A. Carrillo Trust.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on August 4, 2021, in Boston, Massachusetts.

_____
Trevor T. Donelan

## Certificate of Service

I hereby certify that, on August 4, 2021, a true and correct copy of the foregoing declaration of Trevor Donelan and its exhibits were filed through the Court's CM/ECF system, and accordingly, the documents will be sent electronically to all participants registered to receive electronic notice in this case. In addition, the Commission served a copy of the foregoing documents on the following individuals and entities, who are not represented or registered to receive electronic notices in this case, by the following means:

**Defendants:**
Luis Carrillo
    By email to counsel who represented Carrillo in past Commission matters but whose representation is uncertain in this case

Amar Bahadoorsingh
    By email to counsel who represented Bahadoorsingh during a related investigation, but whose representation in this matter is uncertain

Justin Roger Wall
    By email addresses used in connection with his companies and/or brokerage accounts

Jamie Samuel Wilson
    By email addresses used in connection with his companies and/or brokerage accounts

Haydee Yolanda Sanchez Diaz Monge
    By overnight mail to her address available through public records

Martha Y. Jimenez Trust
    By overnight mail to the owners' address of record on real estate documents

Charles A Carrillo Trust
    By overnight mail to the owners' address of record on real estate documents

    /s/ Kathleen Burdette Shields
    Kathleen Burdette Shields